In re Harley L. RACE, Debtor.

Charles WILLISON, Plaintiff,

v.

Harley L. RACE, Defendant.

Bankruptcy No. 93–40406–2.
Adv. No. 93–4048–2.

United States Bankruptcy Court,
W.D. Missouri.

July 5, 1996.

Michael M. Tamburini, Kansas City, MO, and James O. Schwinn, Overland Park, KS, for Debtor/Defendant.

J. Kirk Rahm, Warrensburg, MO, and Erlene W. Krigel, Kansas City, MO, for Plaintiff.

## MEMORANDUM OPINION

FRANK W. KOGER, Chief Judge.

### Background

This matter is before the Court on the First Amended Complaint to Determine Dischargeability of Debt filed by Charles Willison in which he seeks a ruling from this Court that an alleged debt owed to him by Harley L. Race is nondischargeable pursuant to 11 U.S.C. § 523(a)(9).[1] In a prior Memorandum Opinion this Court determined that a motorboat did not fall within the definition of "motor vehicle" in section 523(a)(9) and granted Race's motion to dismiss the complaint. *In re Race*, 159 B.R. 857 (Bankr. W.D.Mo.1993). On appeal, the district court ruled that the term "motor vehicle" was broad enough to encompass a motorboat, and reversed and remanded the case for a deter-

---

1. 11 U.S.C. § 523(a)(9) provides:

    (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

    . . . .

    (9) for death or personal injury caused by the debtor's operation of a motor vehicle if such operation was unlawful because the debtor was intoxicated from using alcohol, a drug, or another substance.

mination of whether Race's operation of the motorboat was unlawful because Race was intoxicated from using alcohol when the accident giving rise to Willison's injury occurred. *Willison v. Race*, 192 B.R. 949 (W.D.Mo. 1995).

On April 25, 1996, a two-day trial commenced on the issue of whether Race was intoxicated when the accident occurred. Just before trial was ready to begin, Race asserted that Charles Willison was collaterally estopped from relitigating the issue of whether he was intoxicated at the time of the boating accident. The Court ordered the parties to submit briefs on the issue of collateral estoppel, then proceeded to trial and admitted evidence on the substantive issue. Instead of merely briefing the issue of collateral estoppel, Race filed a motion for summary judgment contending that Charles Willison was collaterally estopped from relitigating the issue of legal intoxication. The Court has read Charles Willison's response to the motion for summary judgment and is now ready to rule on both the procedural and substantive issues raised in this case.

### Preliminary Matter

■■■ As a preliminary matter, the Court has given a great deal of thought to whether the doctrine of "law of the case" is viable here. "The doctrine of law of the case generally applies to proceedings in a trial court after the case is remanded and to subsequent proceedings in a reviewing court." *In re Curry*, 113 B.R. 546, 552 (D.Neb.1990). "The law of the case doctrine prevents relitigation of a settled issue in a case and requires that courts follow decisions made in earlier proceedings to insure uniformity of decisions, protect the expectations of the parties and promote judicial economy." *Klein v. Arkoma Prod. Co.*, 73 F.3d 779, 784 (8th Cir.1996). *See also Morris v. American Nat'l Can Corp.*, 988 F.2d 50, 52 (8th Cir.1993). Courts should generally " 'refuse to reopen what has been decided.' " *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 761 F.2d 649, 657 (Fed.Cir.1985) (quoting *Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912)).

■■ Normally, a prior decision should be followed unless " '(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial.' " *In re Rainbow Magazine, Inc.*, 77 F.3d 278, 281 (9th Cir.1996) (quoting *Hegler v. Borg*, 50 F.3d 1472, 1475 (9th Cir.1995)). The doctrine of law of the case "allows some flexibility, permitting a court to revisit an issue if an intervening change in the law, or some other special circumstance, warrants reexamining the claim." *United States v. Thomas*, 11 F.3d 732, 736 (7th Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 419, 130 L.Ed.2d 334 (1994).

Here, the Court is faced with the possibility that there has been an intervening change in the law since the district court rendered its opinion ruling that the term "motor vehicle" in section 523(a)(9) was broad enough to encompass a motorboat. In so ruling, the district court relied on two other federal district court cases that had addressed the issue and concluded that the term "motor vehicle" includes motorboats. After the district court filed its opinion, one of those cases, *Boyce v. Greenway (In re Greenway)*, 180 B.R. 179 (W.D.Tex.1995), was reversed in relevant part by the Fifth Circuit Court of Appeals in *In re Greenway*, 71 F.3d 1177 (5th Cir.1996), *cert. denied, Boyce v. Greenway*, —— U.S. ——, 116 S.Ct. 2499, 135 L.Ed.2d 191 (1996). The Fifth Circuit, which as of the date of this opinion is the only circuit court that has considered the issue, examined the plain language of the statute and concluded that a motorboat is not a "motor vehicle" within the meaning of section 523(a)(9) of the Bankruptcy Code. The Fifth Circuit opined:

> Had Congress intended to include motorboats within § 523(a)(9), they would have either defined the term "motor vehicle" to include motorboats or added motorboats to the exception. It is not the job of the courts to legislate, and the Supreme Court has counseled that where the statutory language is plain, "the sole function of the court is to enforce it according to its terms." [Citation omitted.] The district

court erred in reading the term "motor vehicle" in § 523(a)(9) of the Bankruptcy Code to include motorboats. [Citation omitted.] Accordingly, we hold that § 523(a)(9) does not encompass motorboats, and therefore does not bar the discharge of Greenway's debt.

*Greenway,* 71 F.3d at 1180.[2]

Second, on June 4, 1996, the United States House of Representatives passed a bill, H.R. 234 the Boating and Aviation Operation Safety Act of 1996, sponsored by Representative Vernon J. Ehlers from Michigan that would amend 11 U.S.C. § 523(a)(9) by adding language that would bar the discharge of a debt for death or injury caused by the debtor's operation of a watercraft or an aircraft while intoxicated. Section 523(a)(9) would be amended by inserting "watercraft, or aircraft" after "motor vehicle." 142 Cong.Rec. H5784–01 (June 4, 1996). The amendment would apply only in bankruptcy cases filed on or after the act's enactment date. *Id.* Prior to the vote, Representative Ehlers addressed the House of Representatives and stated:

> As my colleagues have heard, this bill is necessary because the current law simply specifies motor vehicle, and that has been interpreted in three different ways by the courts.
>
> . . . .
>
> So it is not only necessary to pass this particular bill to make certain that we include aircraft and watercraft as vehicles whose illegal operations by someone who is drunk or on drugs results in a nondischargeable debt during bankruptcy, but it is also very important to make this clear because the courts have ruled in different fashions in these various cases. Therefore, I appreciate the committee taking up the bill and giving us an opportunity to clarify this.
>
> The bill itself is very simple. It simply makes clear that anyone who is operating a motor vehicle, a watercraft or an aircraft illegally by virtue of being intoxicated from

using alcohol, a drug or another substance may not hide from responsibility for damages by making this a dischargeable debt by declaring bankruptcy.

*Id.*

This Court believes that the introduction and potential passage of a bill by Congress to amend section 523(a)(9) to add the terms watercraft and aircraft greatly supports the conclusion that the term "motor vehicle" in section 523(a)(9) does not encompass motorboats. The proposed amendment begs the obvious question: Why would Congress amend section 523(a)(9) to add watercraft and aircraft if the term "motor vehicle" already included same?

The Court, however, does not feel that the recent Fifth Circuit decision on the issue and proposed amendment to section 523(a)(9) are sufficient to overcome the law of the case doctrine here. Fifth Circuit decisions, although suggestive, are not controlling in the Eighth Circuit. Likewise, the prospective amendment to section 523(a)(9) would not control the outcome here. This Court will treat the district court's ruling that the term "motor vehicle" in section 523(a)(9) includes motorboats as the law of the case and will proceed accordingly.

### General Factual Background

Although the general factual background of this case has been recited in two prior published opinions, for the reader's convenience the Court will set the stage once again:

> On June 9, 1990, the Defendant, Harley Race, was operating a motorboat on the Lake of the Ozarks. The Defendant had been drinking alcohol. The Defendant collided with another motorboat in which the Plaintiff, Charles Willison, and his wife, Brenda Willison, were passengers. Both the Plaintiff and his wife suffered injuries as a result of the accident.

---

**2.** The Court would also note that after the district court issued its opinion in this case, the Honorable Mark W. Vaughn, who is a bankruptcy judge for the United States Bankruptcy Court for the District of New Hampshire, examined this same issue and concluded that a motorboat is not a "motor vehicle" for purposes of section 523(a)(9). *In re Fall,* 192 B.R. 16 (Bankr.D.N.H. 1995).

The Plaintiff and his wife filed suit against the Defendant in the Circuit Court of Jackson County, Missouri, case no. CV90–17496. The Plaintiff's personal injury claims were severed from those of his wife whose claims were tried to a jury. On May 15, 1992 the jury returned a verdict in favor of Brenda Willison awarding her $250,000 in compensatory damages. The jury found that the Defendant was negligent in the operation of his motorboat, but was not liable for punitive damages.

Based upon the jury findings in Brenda Willison's action, the parties agreed to a stipulation of facts in the Plaintiff's action on February 18, 1993. The parties stipulated that the Defendant was liable for negligence in the operation of his motorboat and was not liable for punitive damages. The only issue left to be resolved in the state court proceeding was the amount of damages.

On March 5, 1993, the Defendant filed a voluntary chapter 7 petition with this Court staying the state court action. The Defendant listed his debt to the Plaintiff on Schedule F as contingent and unliquidated. Plaintiff filed his dischargeability complaint on April 14, 1993 in which he alleged that the debt was one for injuries sustained by the Defendant's operation of a motor vehicle while intoxicated under 11 U.S.C. § 523(a)(9) (1992). On June 18, 1993, the Court granted a discharge to the debtor on all dischargeable debts. The Defendant filed a motion to dismiss this action under Bankruptcy Rule 7012 on September 13, 1993. A hearing was held on October 13, 1993 at which time the Court heard statements of counsel and legal arguments.

*In re Race,* 159 B.R. 857, 858 (Bankr. W.D.Mo.1993). The events subsequent to the October 13, 1993, hearing have been set forth above. The Court turns now to the pending issues.

---

**3.** Instruction Number 8 states:
 On the claim of plaintiff for compensatory damages for personal injury against defendant, your verdict must be for plaintiff if you believe:
 First, defendant's motorboat came into collision with the rear of the motorboat occupied by plaintiff, and

*Collateral Estoppel*

Race contends that Charles Willison is collaterally estopped from relitigating the issue of whether he was legally intoxicated at the time of the boat accident. Race argues that the jury in Brenda Willison's state court action against him has already determined that he was not legally intoxicated as shown by the jury's finding that he was not liable for punitive damages. Race relies on instruction numbers 11 and 12 that were given to the jury. Instruction Number 11 states:

If you find in favor of plaintiff under Instruction Number 8,[3] and if you believe that:

First, defendant operated his motorboat while intoxicated, and

Second, defendant knew or had information from which defendant, in the exercise of ordinary care, should have known that such conduct created a high degree of probability of injury, and

Third, defendant thereby showed complete indifference to or conscious disregard for the safety of others,

then, in Verdict A, you may find that defendant is liable for punitive damages.

If you find that defendant is liable for punitive damages in this stage of the trial, you will be given further instructions for assessing the amount of punitive damages in the second stage of the trial.

Instruction Number 12 states:

You must not award plaintiff an additional amount as punitive damages under Instruction Number 11 unless you believe:

First, defendant operated his motorboat while intoxicated, and

Second, defendant knew or had information from which defendant, in the exercise of ordinary care, should have known that such conduct created a high degree of probability of injury, and

---

 Second, defendant was thereby negligent, and
 Third, such negligence directly caused or directly contributed to cause damage to plaintiff.

Third, defendant thereby showed complete indifference to or conscious disregard for the safety of others.

Race argues that all of the elements of collateral estoppel have been met here. He asserts that the issue of legal intoxication before this Court is the identical issue decided by the jury in the state court action, that the jury in the prior state court trial reached the merits of the legal intoxication issue when it denied recovery of punitive damages, that Charles Willison was a party to the prior state court adjudication and was in privity with Brenda Willison, and that Charles Willison had a full and fair opportunity to litigate the intoxication issue in the prior lawsuit. Race contends that by finding in his favor on Brenda Willison's claim for punitive damages, the jury in the prior state court action necessarily and unambiguously determined that he was not intoxicated when the accident occurred. Race argues that Charles Willison is bound by the jury determination in Brenda Willison's trial.

█ It is well-settled that collateral estoppel applies in dischargeability proceedings before the bankruptcy court. *Grogan v. Garner*, 498 U.S. 279, 284 n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991). This Court will look to Missouri law to determine the preclusive effect of the jury's decision. *See Baker v. McCoy*, 739 F.2d 381, 384 (8th Cir.1984). In Missouri collateral estoppel, also known as issue preclusion, applies when the issue in the present action is identical to the issue decided in the prior adjudication; the prior adjudication resulted in a judgment on the merits; the party against whom collateral estoppel is asserted is the same party or is in privity with a party in the prior adjudication; and the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior suit. *State ex rel. Haley v. Groose*, 873 S.W.2d 221, 223 (Mo.1994). *See also Wellons, Inc. v. T.E. Ibberson Co.*, 869 F.2d 1166, 1168 (8th Cir.1989) (same elements).

█ Here, Race has the burden of proving that all the elements of collateral estoppel are present. *See In re Day*, 137 B.R. 335, 338 (Bankr.W.D.Mo.1992). The Court

determines that Race has failed to meet that burden.

In this case, the jury verdict in the prior state court action did not result in a judgment on the merits on the issue of whether Race was legally intoxicated at the time the boating accident occurred. A careful reading of Instruction Number 11 shows that the jury had discretion to not assess punitive damages against Race even if the jury believed that Race was intoxicated. Just because the jury did not find Race liable for punitive damages does not mean that it found Race was not intoxicated. The jurors could have found that Race was intoxicated at the time of the accident, but did not believe that it was appropriate to award punitive damages to Brenda Willison. Further, the jurors had to find that all three elements of Instruction Number 11 were present before even considering whether to award punitive damages. It is possible that the jury found that Race was intoxicated, but that the second and third elements of Instruction Number 11 were not met. It is just as possible that the jury did not find Race liable for punitive damages because the jurors found that Race was not intoxicated. The Court declines Race's invitation to make assumptions and second-guess the decision of the jurors in the prior state court action. Just because the jury in the prior state court action did not award punitive damages does not mean that Charles Willison cannot carry his burden of proof in this nondischargeability proceeding. *See In re Pulley*, 196 B.R. 498 (Bankr. W.D.Ark.1995) ("The fact that punitive damages were not imposed does not necessarily negate a finding of wilful and malicious injury by the state court.").

The Court determines that Charles Willison is not collaterally estopped from relitigating the issue of whether Race was legally intoxicated at the time the boat accident occurred. The Court denies Race's motion for summary judgment.

*Whether Race was Legally Intoxicated At the Time the Boat Accident Occurred*

█ In order to succeed on his dischargeability objection under section 523(a)(9), the burden is upon Charles Willi-

son to prove each element by a preponderance of the evidence. *In re Casagrande,* 143 B.R. 893, 896 (Bankr.W.D.Mo.1992) (citing *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). The only element remaining to be proven by Charles Willison is whether Harley Race was legally intoxicated when the boat accident occurred. Here, the Court finds that Charles Willison failed to meet his burden to prove that Harley Race was legally intoxicated at the time of the accident.

The Court listened to the witnesses who testified at this trial, has read the depositions and former trial testimony admitted at this trial and has reviewed all the remaining relevant documentary evidence. The Court will note at this point that it finds the testimony of Harley Race to be credible. From all the evidence in this case the Court finds as follows. On June 9, 1990, Harley and his former wife, Evon Race, were at their residence at the Lake of the Ozarks. At about 11:00 a.m. two of Harley's friends, John Thomas and his girlfriend Theresa, came over to the house to go waterskiing. Harley prepared a gallon of what he liked to refer to as a fruit drink to take with them when they went out on the lake. The fruit drink consisted of Five Alive, pink lemonade, club soda, 7–Up, one pint of vodka and water. About 12:00 p.m. the two couples took John Thomas's boat out on the lake. Evon, John and Theresa took turns waterskiing while Harley took turns with John driving the boat. They stayed out on the water until about 5:00 p.m. While out on the lake, all four were drinking the fruit drink. Between noon and 5:00 p.m. Harley drank two or three glasses of the fruit drink. During the time period between noon and 7:00 p.m., Harley drank four or five glasses of the fruit drink. Harley described the glasses as plastic cups that held between six to eight ounces of liquid. Harley first put ice into the plastic cup, then filled the cup with the fruit drink. During this time period, Harley's ability to function was not impaired by the consumption of the fruit drink. After returning to the Races' lake home about 5:00 p.m., the couples discussed going to dinner. They decided to go to the Captain's Galley, which was approximately seven miles from the Races' home.

Harley and Evon had been arguing virtually all day long. They had been married about 20 to 21 years and since the beginning of 1988 the marriage had been quite volatile. It was common for Harley and Evon to have loud, nasty arguments in which they accused each other of being involved with other people. On occasion Harley and Evon would make vulgar comments to each other. Evon had filed for divorce in 1988. Harley had filed for divorce in 1989. They would alternate between periods of separation and living together. By June 9, 1990, the marriage was very strained, and in fact Evon filed for divorce again a day or two after the boat accident. To avoid further arguments, Harley went to the Captain's Galley alone in his boat, a 23–foot Wellcraft Nova, while John Thomas drove his boat and took Theresa and Evon to the restaurant.

Harley arrived at the Captain's Galley about 7:30 p.m. John, Theresa and Evon arrived shortly thereafter. Harley had no problems operating or controlling his boat when he drove it from his residence to the restaurant. Harley spoke with William Paul, the owner of the Captain's Galley, prior to being seated. After the two couples were seated, Harley ordered a catfish dinner and a martini, which he drank with dinner. Evon also ordered a martini, which she drank. Harley ate every bit of his dinner, which consisted of a whole catfish, an order of french fries, coleslaw and cornbread (hushpuppies). The only alcoholic beverage Harley drank at the Captain's Galley was the one martini. Harley and Evon were not speaking to each other at dinner. The couples left the Captain's Galley about 9:00 p.m. or 9:30 p.m. Evon rode back to the Races' lake home in John Thomas's boat. Harley drove back to the lake home alone in his boat, which suited him because he was tired of arguing with Evon.

Because it was dark when he left the Captain's Galley, Harley had to install the white running light on his boat so that his boat would be visible to other boat traffic on the lake. The light is removable from the boat and is not normally used during daytime operation. The light is on the end of a three-

foot pole and when installed is located in the center of the boat in front of the windshield. To install the light Harley had to lean in an extended reach across the dash and windshield and insert the bottom of the pole, which had four prongs and a "V" insert, at an angle into a guide that puts the pole down to the point where it is implanted into the boat. The four prongs and the insert must be exactly lined up with the guide and the four prongs have to be in the right holes before the light will work. When the current is connected the pole is then screwed down. The receptacle for the pole is between a half and three-quarters of an inch across, or smaller than a quarter. Harley had to install the light while the boat was waving up and down in the dock. Harley was able to install the light without any difficulty and on his first try. The running light was operational when Harley left the Captain's Galley. When he left the Captain's Galley Harley had no problem untying the boat and backing it out of the dock. The consumption of the fruit drink plus the one martini did not impair Harley's ability to install the running light, nor impair Harley's ability to untie his boat and back it out of the restaurant's dock. After Harley left the Captain's Galley he did not consume any other alcoholic beverages.

The former trial testimony of William Paul was admitted at this trial. Paul, although not licensed to practice law in Missouri, served as district attorney in Texas for three counties prior to purchasing the Captain's Galley. Paul met Harley and Evon after he bought the restaurant. In the summer of 1990 Paul was aware that Harley and Evon were having marital problems. One evening prior to June 9, 1990, Evon delivered Harley's boat to the Captain's Galley and at her request Paul took it to the Mariner Yacht Club marina to be placed in storage. Paul remembered Harley coming to his restaurant the evening of June 9, 1990, in his boat at about 7:30 p.m. or 8:00 p.m., and then being joined by Evon and another couple. Paul's first reaction when he saw Harley in the Captain's Galley was he remembered that he had stored Harley's boat for Evon and thought that maybe Harley was "coming to pay me a visit." Paul greeted Harley, shook his hand and observed the two couples while Paul was milling around the restaurant greeting other customers. As a former district attorney and as the owner of the Captain's Galley Paul had experience with intoxicated people. Paul testified that Harley did not appear to be under the influence of alcohol or impaired in any way by alcohol when he arrived at the restaurant.

Paul recalled that Harley was served one drink while he was in the restaurant. Paul stated that Harley left the Captain's Galley about 9:00 p.m. or 9:30 p.m. and that Harley did not appear to be intoxicated when he left the restaurant. Paul watched Harley install the running light into his boat before Harley left the restaurant's dock. Paul had gained experience installing this particular light when he had stored Harley's boat for Evon and Paul characterized the running light as "an unusual anchor lighting system." Paul stated that he had difficulty when he installed the running light, but that when Harley left the restaurant Harley installed the light perfectly. Paul stated that one of the bases for his opinion that Harley was not under the influence of alcohol when he left the Captain's Galley was that a person could not install the running light while drunk. Paul recalled that Harley left the restaurant alone in his boat and that Evon left with the other couple. The Court finds William Paul's prior trial testimony to be credible.

After leaving the Captain's Galley, Harley immediately headed for his lake home. Harley's boat was in front of John Thomas's boat on the way back. Harley did not try to splash water on Thomas's boat or on its occupants, or drive up next to Thomas's boat while driving home. They arrived at the lake home at approximately 10:00 p.m. Harley got home first and hoisted his boat out of the water and into his dock, then caught Thomas's boat and anchored it to a swimming platform located about twenty feet away from the dock. John Thomas and Theresa then walked up toward the lake house.

After they arrived home, Harley and Evon started arguing again when Evon asked Harley "is this what you do when your girlfriend comes over?" The argument escalated and

Harley and Evon made allegations against each other in regard to their respective behavior with other people down at the lake. The argument became loud and quite heated. Harley used profanity and became quite vulgar in the argument with Evon. After John Thomas and Theresa left, the argument between Harley and Evon "really got rolling and louder and louder" and at approximately 10:30 p.m. Harley decided that the only way he could "cure this" was "just to get in the boat and leave."

Harley turned on the hoist to lower his boat, got in the boat and started it just before it entered the water. Harley stated that because the boat was out of the water when he started it the noise was extremely loud, but the noise softened up a little bit when the boat hit the water. Harley backed the boat out of the dock, shoved the throttle forward on the boat, opened the engine all the way up to its full r.p.m. to leave the cove, then pulled the throttle back to about 25 or 30 miles per hour. Harley did not take any alcoholic beverages with him when he left his home. Harley did not know where he was going when he left the lake house only that he was "[j]ust [getting] away from [Evon]." When he got to the end of the cove Harley turned left to try to find an open restaurant/bar. Harley went to a restaurant/bar called Mickeyland, but it was closed. Harley did a U-turn in front of Mickeyland and went back across to George Banana's, which was also closed.

Harley then headed for the Boardwalk, which was five miles in the opposite direction just beyond the Mariner Yacht Club at the junction of the Linn Creek, the Osage and the Big Niangua. Harley was driving his boat at about 25 to 30 miles per hour and was not having any problems controlling or operating the boat. As Harley was going through the junction, he looked up at the home owned by John and Kelly Brock, which was located up on a cliff or a bluff, and saw their lights come on. When Harley looked ahead again he saw a big, black blob about two of his boat-lengths in front of him. Harley turned the steering wheel as far as he could to the right, but was unable to avoid colliding with the 36–foot Chris Craft cabin

cruiser in which Charles and Brenda Willison were passengers. Harley testified that he did not see lights on the cabin cruiser before the collision.

At approximately 11:20 p.m. to 11:30 p.m. Harley's boat collided with the rear end of the cabin cruiser then continued up over the top of that boat. Harley was propelled backwards out of his boat and into the water. Harley went under the water and fought his way back to the surface. When he broke the surface of the lake, Harley heard people hollering. Harley saw a man, who was later identified as Charles Willison, in the water. Harley located a big piece of wooden boat debris that was floating in the water, then pushed Charles up out of the water so that he could hang onto the wood float. Harley and Charles heard Brenda Willison hollering and swam the wood float over to her. Harley then pushed Brenda up out of the water so that she too could hang onto the wood float. While waiting for help Charles and Brenda were having trouble hanging onto the wood float. Harley continued to assist Charles and Brenda and helped them hang onto the wood float. No one refuted Harley's testimony that he helped Charles and Brenda after they were ejected from the cabin cruiser into the lake during the collision. Charles and Brenda Willison were present in the courtroom during trial, but neither testified.

Charles and Brenda Willison were both seriously injured in the collision. Harley was hit in the head, suffered a broken nose and almost bit his tongue in half during the accident. Harley was bleeding from his mouth and nose. Harley testified that he could smell gasoline while he was in the water and his boat was on fire.

At some point in time a boat driven by John and Kelly Brock arrived at the accident scene. Harley helped John Brock put Charles into the Brock's boat and then helped put Brenda on the boat's swim platform. Harley got on the swim platform and held Brenda while John and Kelly Brock drove over to the cabin cruiser to rescue the remaining two adults and two children who were still on board and then drove back to the Mariner Yacht Club marina. After they

reached the marina, Harley stayed with Brenda for awhile to make sure she did not roll off of the swim platform and into the water. When someone else was able to assist Brenda, Harley thought it was time to try to contact his family and tell them about the accident.

By that time Harley was in pain from his injuries. Harley could tell his nose was broken because he could move it from side to side, he knew his tongue was cut badly, and he could see that his right leg was bruised and skinned up. Harley was still bleeding from his mouth and nose and his eyes hurt and felt like they had sand in them. Harley walked up to a pay phone about 75 or 80 feet away from where John Brock had docked the boat. Harley still had change in his pocket. Harley dialed his lake home number, but the line was busy. Harley tried to dial that number two or three more times, but the line was still busy. Harley dialed his Kansas City home number, but only got a recording. Then Harley dialed a friend's number at the lake, but got no answer. Harley was not having any problems pushing the buttons on the pay phone or making the calls, he just did not get an answer anywhere he tried to call.

Within 15 to 30 minutes after the collision, Missouri State Water Patrolman Terry Lee arrived on the scene. Lee was on duty that night and was in his uniform. When Lee arrived he saw Harley Race dialing the pay phone, hanging up the receiver, putting money in again, dialing the pay phone again, and hanging up the phone "like he was trying to get someone and either getting a busy signal or not getting the number." Someone told Lee that Harley was the driver of the Wellcraft and Lee went over to Harley to talk to him. Lee testified that he approached Harley to within three or four feet and smelled "an odor of alcohol about ·him." Lee saw that Harley had a "real red complexion and his face seemed real puffy and real bloodshot eyes." When Lee requested that Harley speak with him, Harley looked at him then turned around and started dialing the phone again. After Lee requested for a second time that Harley talk with him, Harley turned around, used vulgar profanity and

said that he was using the phone. Lee stated that Harley was speaking in a loud and angry voice. After the second or third time of asking Harley to speak with him, Lee took the phone out of Harley's hand, put it on the receiver and told Harley that he was going to have to talk to him. Lee stated that he "believe[d]" that at that point in time Harley put his hand on Lee's chest and pushed him back.

After Harley told Lee that he had run into a boat that did not have any lights, Lee began questioning Harley about how much he had to drink. Harley told Lee that he had not been drinking. Harley testified that he got angry with Lee and that he and Lee exchanged comments about what had happened. Harley told Lee that he did not cause the accident and asked Lee why he was harassing him. In response to Lee's questions concerning Harley's drinking, Harley again told Lee "point-blank that I wasn't drunk." Harley and Lee both agreed that they were very loud with each other in their conversation at the pay phone. Harley put a cigarette in his mouth that had been offered to him by a bystander, Lee asked Harley not to smoke, Harley used vulgar profanity, Lee unsuccessfully tried to grab the cigarette, Harley grabbed Lee's arm and pushed him, then Lee advised Harley that he was under arrest. Lee told Harley that he was being arrested for operating a motorboat while intoxicated and resisting arrest, which were misdemeanor violations. Lee grabbed Harley's arm and attempted to move it behind him. Harley complained to Lee that he had a shoulder problem and stiffened his arm and propelled Lee backwards.

Lee stated that there was a lot of yelling and some other officers came over to help him. Because Harley either was so muscular or lacked flexibility he could not get his arms to come together behind him close enough for one pair of handcuffs, so the officers used two pairs of handcuffs to handcuff Harley. Harley allowed the officers to handcuff him. Lee and Missouri State Highway Patrol Trooper George Hamilton transported Harley in Hamilton's patrol vehicle to the Camden County Sheriff's Department.

Lee stated that at the sheriff's office he asked Harley to take a breathalyzer test, but Harley refused. Lee admitted, however, that at that time under Missouri law a driver of a motorboat was not required to take a breathalyzer test and that Harley had a right under Missouri law to refuse the breathalyzer test. Harley was still very upset at that point in time, and decided that since Lee had already arrested him for being drunk that there was no sense in taking the breathalyzer.

Harley still had blood coming from his mouth and nose and at that point in time Harley was experiencing "probably the worst of all the pain." Harley's nose was "really, really hurting," his tongue had "begun to really swell" and he could hardly talk. Harley told Lee that his tongue, nose and head hurt. Harley also informed Lee that he was on prescription blood pressure medication and another prescription medication to control depression and to curb a problem with anger.

On June 10, 1990, at 12:50 a.m. Lee filled out an Alcohol Influence Report, which contains categories of observations that may be considered "indicators" of intoxication. Lee marked Harley's ability to understand instructions as poor. Lee marked the odor of alcohol as strong. Lee described Harley's speech as "tight-lipped" because Harley did not want to talk much and as having an "accent" because it was "kind of a gruff . . . kind of accent." Lee marked Harley's attitude as cocky, indifferent and combative. Lee attempted to give Harley field sobriety tests. Lee tried to get Harley to count backwards from 86 to 71, which Harley was unable to do. Harley testified that he could not "concentrate on my numbers or anything else. My tongue was hurting. I'm mad at this guy for accusing me of this boat wreck. My face hurt, so I just told him I wasn't doing it." On several occasions, Lee asked Harley to say his ABC's backwards, which Harley refused to do. Lee asked Harley what time it was and Harley did not know. Harley stated that the reason he did not know what time it was is that he had just been in a wreck, his face was hurting "like heck," he witnessed two people who had been

badly hurt, and the furthest thing from his mind was what time it was. Harley was unable to tell Lee the exact date of the month. In the remarks section of the Alcohol Influence Report Lee wrote that what first led him to suspect alcohol influence was the "strong smell of intoxicants" and Harley's "unusual actions at the phone, dialing, hanging up, redialing, not looking at the phone."

On cross-examination Lee agreed that the mere fact that someone calls a telephone number and no one answers or the caller gets a busy signal then hangs up and redials and makes another call is not an indication of intoxication. Lee further agreed that Harley's red eyes and puffy face would not be an unusual condition for someone who had been in the water following a boat accident, particularly water that may have contained gasoline, and that Harley's puffy face would not be unusual for someone who had been in a boating accident wherein he received a blow to his face sufficient enough to break his nose. Lee agreed that Harley's red eyes and puffy face either could have been an indicator of intoxication or could have been the result of Harley's involvement in the boating accident.

Lee marked his observations of Harley on the Alcohol Influence Report, but admitted that as perceived under the Alcohol Influence Report, any action of a person can be an indicator of intoxication. Lee was aware that Harley had suffered a head injury, a broken nose, and that he had almost bit his tongue in half in the accident and agreed that Harley's poor ability to understand instructions could have been the result of the physical injuries that Harley sustained in the boating accident. Lee did not mark on the Alcohol Influence Report that Harley's speech was mumbled or slurred because he did not feel those categories applied, but Lee marked "tight-lipped," which meant that Harley was uncooperative and refused to answer or cooperate. Lee marked "accent" under the speech category, which meant "an accent kind of like a wrestler—the way they talk when they're aggressive kind of." Lee agreed that a wrestler can be aggressive and have an accent without having any alcohol

consumption. Lee marked "cocky" on the Alcohol Influence Report, which meant uncooperative type. Lee marked the mutually exclusive descriptions of combative and indifferent on the report because Harley exhibited both types of behavior during Lee's period of observation.

Lee agreed that it would not be unusual for someone who has just been involved in a major accident who has a head injury to not know what time it was without looking at a watch. Lee also agreed that it was not unusual for someone to not know the exact date of the month, particularly someone who had just been in a major boating accident with a head injury.

Lee further testified that although he asked Harley if he had been drinking, to which Harley responded "no," Lee did not specify a particular period of time prior to the accident. Lee did not ask Harley if he had been drinking right before the accident. Lee perceived the question to be for any time period. Lee eventually asked Harley if Harley had had anything to drink at all the entire day and Harley responded that he thought he had drank the equivalent of about three beers, but did not specifically mention that he had drank a martini with dinner or that he had drank the fruit drink containing the vodka earlier that afternoon. Lee agreed that just because someone had an alcoholic beverage earlier in the afternoon would not make the person intoxicated prior to an accident that occurs at 11:30 p.m. that night. Lee also agreed that a person who has one martini at 8:00 p.m. or so in and of itself would not make the person operating a boat under the influence of alcohol.

Lee also testified that he never smelled the odor of gasoline coming from Harley even though Harley's boat was on fire and there was gasoline in the water in which Harley had been floating while waiting to be rescued.

At the sheriff's office prior to Harley's release from custody, Lee also charged Harley with negligent and reckless operation of a motorboat, another misdemeanor violation. In spite of Harley's continued declarations that the accident was not his fault and assertion that the other boat with which he had collided did not have any lights, Lee did not do any further investigation into the accident and never checked to ascertain whether or not the other boat had its lights on at the time of the accident prior to adding this charge.

Later during the course of his investigation, Lee contacted Charles and Brenda Willison. Charles and Brenda refused to speak with Lee during his investigation. Lee repeatedly asked Charles and Brenda to cooperate, but they refused to ever talk with Lee and never gave him any type of written statement that Lee could put in his investigation report. Even though Charles and Brenda refused to cooperate with Lee during the criminal investigation, Lee cooperated with the Willisons' attorney in presenting evidence in regard to the civil lawsuits that the Willisons had filed against Harley. Lee stated that he met with the Willisons' civil attorney and attempted to restage and recreate the accident using other boats a week before the civil trial because his supervisors had authorized and told him that he could cooperate with the Willisons on anything they needed. Although his official investigation of the case was finished, Lee went to the lake and helped the Willisons' attorney because of his interest in the civil lawsuit against Harley. Lee admitted that it was unusual to have such a one-way street of cooperation.

On or about June 25, 1990, Lee took it upon himself to go to the Camden County Prosecuting Attorney and requested that second-degree felony assault charges be filed against Harley. Lee understood that each felony charge carried a maximum jail sentence of seven years. Harley subsequently was charged with two counts of second-degree assault, class C felonies. Before trial, Harley pleaded guilty to reckless and negligent operation of a watercraft in exchange for all other charges being dismissed.

Lee's investigation report shows that at approximately 1:30 p.m. (Lee must have been a little confused about the time and meant approximately 1:30 a.m.) on June 10, 1990, Harley was finally offered the opportunity to seek medical treatment. Harley declined. Before being released from custody Harley

was required to call a bail bondsman to post bond on the three misdemeanor charges. Harley called Jim Burns, whose prior trial testimony was admitted at this trial. Burns is a professional bail bondsman and had been so for about 12 years prior to being contacted by Harley during the early morning hours of June 10, 1990. During the course of his occupation, Burns had bailed out of jail on the average of about 100 people a year who had been charged with being intoxicated. Burns arrived at the Camden County Sheriff's Department shortly after 2:00 a.m. At that point in time Burns met Harley and had an opportunity to ascertain whether or not he could smell any alcohol coming from him. Burns testified that he could not smell any alcohol coming from Harley and that during the time that he was with Harley, Harley did not exhibit any characteristics that would lead him to believe that Harley was under the influence of alcohol or was intoxicated. Burns testified that he was surprised that Harley had been charged with driving a boat while intoxicated because Harley did not appear in any way to be intoxicated. The Court finds Burns' testimony to be credible.

George Hamilton, the Missouri State Highway Patrol Trooper who helped transport Harley to the Camden County Sheriff's Department after the accident, also testified at this trial. Hamilton testified that Harley's eyes were bloodshot and that he could smell a strong odor of alcohol about Harley's breath, but he smelled the alcohol only when he was seatbelting Harley into the patrol car. Hamilton stated that it was possible that Harley was intoxicated, but he did not reach a conclusion one way or another. Hamilton did not recall any odor of gasoline when Harley was in the patrol car. Hamilton prepared a written statement in which he described Harley's behavior as uncooperative, cocky and evasive, but on cross-examination Hamilton agreed that those three characteristics do not mean that a person is intoxicated.

The deposition testimony of Deriek Braun taken on April 25, 1996, was admitted at this trial. On June 9, 1990, Braun was seventeen years old and was vacationing at the Lake of the Ozarks with his girlfriend, her sister and her sister's fiance on his parents' boat. The boat was docked at the Mariner Yacht Club marina. Braun did not see or hear the collision, but saw Harley's boat on fire after the accident. After John and Kelly Brock had brought in Harley, the Willisons, and the other people rescued from the accident, Braun and a friend went out on the lake and towed the cabin cruiser in to the marina service dock using his ski boat. When he was tying the cabin cruiser to his boat, Braun could smell gasoline from the gas tanks that had been broken open. Braun testified that he smelled a strong odor of gasoline and he was aware that there was gasoline in the water.

Braun stated that it took about 15 or 30 minutes to tow in the cabin cruiser. When he was walking back to his parents' boat, Braun saw Harley and a police officer at the pay phone, which was located about three feet from the entrance of the dock at which his parents' boat was docked. Braun testified that he was four to eight feet away from Harley, that he stopped "for a second" and that he "kind of smelled alcohol on him." Braun remembered that Harley was cursing and was acting "obnoxious" towards the police officer. Braun did not see the entire episode between Harley and the police officer because of other distractions in the area, such as ambulances arriving at the dock. Braun testified that he thought that Harley "could be intoxicated" based on his observations and the smell of alcohol during the second or two that he stopped to watch Harley. The last thing Braun remembered was Harley attempting to light the cigarette. On June 10, 1990, Braun prepared a written statement, which was included in Lee's accident investigation report. In the narrative portion of the statement Braun made no reference whatsoever of being in the same area in which Harley was using the pay phone nor any reference to smelling alcohol on Harley.

The Court admitted as evidence in this trial the prior trial testimony of Carla Armfield. On June 9, 1990, Armfield was with Braun on his parents' boat when the accident occurred. Armfield was on the pay phone calling 911 as John and Kelly Brock were

bringing in the accident victims. Armfield was still on the pay phone with 911 when Harley came up to use the phone. Armfield testified that she was about 15 feet away from Harley and was not close enough to detect any odor of alcohol. Armfield noticed that Harley was wet and testified that the only time she paid attention to him after that was when he caused a scene with the police officers. Armfield stated that Harley was loud and cursing and that Harley would not hang up the telephone after the police officer requested that he do so. Armfield characterized Harley's behavior at the pay phone as "just shocking ... almost like he had this violent temper." The last time Armfield saw Harley some other officers had become involved, there was a scuffle and the phone got hung up.

As previously mentioned, Evon Race filed for divorce on or about the day following the boat accident. The divorce was granted sometime in December of 1991. Harley testified that during the course of the divorce proceedings he and Evon were at odds with each other about all kinds of issues involving the division of property. During the course of the divorce action, Harley caught Evon hiding property and claiming that she no longer had it when in fact she did. Harley stated that while the divorce was pending, on a lot of occasions Evon threatened him as to what she might testify about in regard to the boat accident. Harley testified that Evon told him that if he did not give her what she wanted in the divorce, "she would appear wherever they wanted her to" and that she would say things that were not true. Harley stated that prior to the accident and during the course of the divorce proceedings there had been times when Evon called the police and made allegations against him that were not true.

At this trial the Court admitted as evidence the prior trial testimony of Evon Race. The Court finds Evon's testimony to be vindictive and portions of it to be incredible. The Court believes that Evon would say anything that she thought would get Harley into trouble. With that said, the Court notes that Evon did substantiate Harley's testimony that the couple had been arguing the day and evening of June 9, 1990, and that Harley was angry with her. Evon also testified Harley was not experiencing any problems driving John Thomas's boat in regard to Harley's consumption of alcohol and the only reason she gave for not wanting to ride with Harley to the Captain's Galley for dinner was that she was afraid after the argument. Further, Evon never testified that Harley had anything to drink after they left the Captain's Galley.

The Court also admitted the prior trial testimony of Sandra Meagher at this trial. Meagher's lake home was located three houses away from the lake home owned by Harley and Evon. Because of the curving shore line, the distance between the two homes was only about 50 yards on an angle. Meagher testified that on the evening of June 9, 1990, she was at her lake home with a friend and heard voices shouting and cursing and saw Harley and Evon standing on the Races' boat dock. Meagher also stated that she heard Harley's boat engine running very loudly before Harley sped away from the boat dock faster than anyone had ever left the cove before. The Court finds that Meagher's testimony also substantiates the fact that Harley and Evon were arguing the night of June 9, 1990, before Harley got in his boat and left his lake home.

There is no question in this case that a tragic boat accident occurred on the night of June 9, 1990, however, Charles Willison has absolutely failed to prove that Harley Race was intoxicated at the time the collision occurred. Harley candidly admitted that during the daytime hours of June 9, 1990, he drank a fruit drink concoction that contained vodka and that he drank one martini with dinner between approximately 7:30 p.m. and 9:30 p.m. that same evening. The Court believes Harley's testimony that he was not impaired by alcohol when he left the Captain's Galley at approximately 9:00 p.m. to 9:30 p.m. that evening. William Paul, the proprietor of the Captain's Galley, testified that Harley was served one drink while he was at the restaurant and that Harley was not intoxicated when he left the Captain's Galley. Paul testified about Harley performing the very intricate maneuver of installing

the running light on his boat before leaving the restaurant and stated that a person would not have been able to install that running light if intoxicated. No one testified that Harley had anything to drink after he left the Captain's Galley at approximately 9:00 p.m. to 9:30 p.m. on the night of June 9, 1990.

The evidence shows that Harley and Evon had been arguing throughout the day and evening on June 9, 1990, and that the argument escalated after Harley and Evon returned home from the Captain's Galley. The evidence shows that Harley became very angry and loud during the argument with Evon and the Court believes that Harley left his lake home at approximately 10:30 p.m. in a very angry state of mind.

The Court believes that Terry Lee harbors a personal animosity and bias against Harley Race. Lee's testimony at this trial was clearly tinged with personal bias and animosity. The Court arrived at this finding after observing Lee's demeanor when he testified at the trial; after listening as Lee testified that he voluntarily assisted the Willisons in the civil suit against Harley even though the Willisons absolutely refused to cooperate in the criminal investigation and even though such one-way street cooperation was unusual; and after listening to Lee's testimony that about two weeks after the boat accident he took it upon himself to ask the Camden County Prosecutor to bring second-degree felony assault charges against Harley. The Court further finds that Lee's conflicting testimony and the Alcohol Influence Report prepared by Lee simply do not substantiate that Harley was under the influence of alcohol at the time the collision occurred. Lee admitted that all of the "indicators," other than the odor of alcohol, which led him to believe that Harley was intoxicated could have been the result of the injuries that Harley sustained in the boat accident; or the result of Harley's being submerged in the lake water; or were not displays of unusual behavior, such as dialing and redialing the pay phone. Lee further testified that relative to the Alcohol Influence Report virtually any action by a person could be an indicator of intoxication. George Hamilton only smelled alcohol on Harley's breath when he was seatbelting him into the patrol car, and Hamilton did not conclude that Harley was intoxicated. Further, even though both Harley and Deriek Braun testified that there was gasoline in the water in which Harley had been submerged and floating, neither Lee nor Hamilton remembered smelling gasoline on Harley. Jim Burns, the bail bondsman, testified that at 2:00 a.m. in the morning of June 10, 1990, he did not smell any odor of alcohol coming from Harley and that Harley did not exhibit any characteristics of one who is under the influence of alcohol or intoxicated. Burns testified that he did not believe Harley was intoxicated and that he was surprised that Harley had been charged with operating a motorboat while intoxicated.

The Court finds that Harley's continued unsuccessful attempts after the accident to contact his family and/or friends at the marina pay phone were not the result of Harley being intoxicated, but resulted from Harley continually getting a busy signal or no answer at the numbers he was trying to call. The evidence certainly shows that Harley became very angry and obnoxious with Lee at the pay phone after the accident and as characterized by Carla Armfield, Harley displayed a violent temper. Although Harley's reaction to Lee's request to question him was at the very least inappropriate, the Court finds that Harley reacted to Lee out of anger and not from being under the influence of alcohol. The Court further finds that all the remaining "indicators" of intoxication to which Lee testified and as reflected in the Alcohol Influence Report were the result of the injuries that Harley sustained in the boat accident, the result of Harley being submerged in lake water containing gasoline, and the result of Harley's angry behavior. Although this Court has declined to find collateral estoppel from the civil suit jury's determination that no punitive damages should be awarded, the Court has the distinct impression that the civil suit jury came to the same conclusion that this Court did; i.e., intoxication on the part of Harley Race was not proven by the plaintiffs. Further, it is the Court's belief, and a partial basis for its ruling, that a disgruntled water patrolman and a vindictive wife supply the only indica-

tion that Harley Race was intoxicated. The Court has no brief for Harley Race's conduct that evening. It merely believes that there was insufficient evidence of intoxication to satisfy Charles Willison's burden of proof. The Court finds that Harley Race was not legally intoxicated at the time of the boat accident.

Charles Willison has failed to prove that Harley Race was intoxicated under 11 U.S.C. § 523(a)(9) and the Court denies his nondischargeability complaint.

### Conclusion

Based on the above discussion, the motion for summary judgment filed by Harley L. Race is DENIED and the complaint filed by Charles Willison under 11 U.S.C. § 523(a)(9) is DENIED.

The foregoing Memorandum Opinion constitutes Findings of Fact and Conclusions of Law as required by Fed.R.Bankr.P. 7052.

So ORDERED.